NOT DESIGNATED FOR PUBLICATION

No. 123,869

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
L.B., M.B., and Y.B.,
Minor Children.

MEMORANDUM OPINION

Appeal from Bourbon District Court; MARK ALAN WARD, judge. Opinion filed November 24, 2021. Affirmed.

*Mark E. Fern*, of The Law Office of Mark E. Fern, of Pittsburg, for appellant natural father.

*Brandon D. Cameron*, assistant county attorney, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and BUSER, JJ.

PER CURIAM:  Father challenges the trial court's termination of his parental rights over his three daughters, L.B., Y.B., and M.B., whose respective mothers' parental rights were also terminated but are not at issue in this appeal. On appeal, Father first argues that the trial court erred when terminating his parental rights because its approved reintegration case plan tasks were unreasonable. Nevertheless, because Father stipulated to being presumptively unfit as meant under K.S.A. 2020 Supp. 38-2271(a)(6), Father cannot challenge his reintegration case plan tasks as unreasonable. Under the plain language of K.S.A. 2020 Supp. 38-2271(a)(6), by stipulating to his unfitness, Father also stipulated that his reintegration case plan tasks were reasonable. See *Water Dist. No. 1 of Johnson Co. v. Prairie Center Dev.*, 304 Kan. 603, 618, 375 P.3d 304 (2016) (holding that party who invites error cannot complain about that error on appeal).

1

Next, Father argues that the trial court's finding that he failed to rebut his presumption of unfitness was not supported by clear and convincing evidence. The facts, however, of this case establish that Father largely failed to comply with his reintegration case plan tasks during the 31 months the children remained out of his care and custody. Given this, clear and convincing evidence supported the trial court's finding that Father failed to rebut his presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(6).

Finally, Father argues that the trial court's best interests of the children determination was not supported by clear and convincing evidence. Although the court's best interests of the children finding was brief, the court's termination order found that it was in the children's best interests to terminate Father's parental rights. Father fails to recognize that the trial court's best interests finding only requires the support of a preponderance of evidence and is reviewed for abuse of discretion. K.S.A. 2020 Supp. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). Also, if Father believed that the court's best interests of the children fact-finding was inadequate, he needed to object to its inadequacy while before the trial court. See *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998) (holding that this court presumes that trial court made all fact-findings to support its judgment when party fails to challenge those fact-findings as inadequate while before trial court).

After reviewing all the evidence, in the light most favorable to the State, we conclude that Father's arguments are unpersuasive. Thus, we affirm the trial court's termination of Father's parental rights over L.B., Y.B., and M.B.

FACTS

*Background*

On September 14, 2016, the State of Kansas filed a motion asking that the trial court place L.B., M.B., and Y.B. in the Department for Children and Families' (DCF) custody. In its motion, the State alleged that L.B.—born in April 2005, M.B.—born in May 2008, and Y.B.—born in February 2010, could not safely remain in Father's custody given what law enforcement discovered during a September 11, 2016 welfare check at Father's house in Fort Scott, Kansas. During that welfare check, law enforcement discovered that Father as well as the babysitter, J.M., did not know where the children were located. And after law enforcement found the children, law enforcement learned from the children that they only ate "at school or church events," that Father's house had no heat, and that Father's house had no running water.

Once the State filed its motion, the trial court immediately held a temporary custody hearing on the matter. At this hearing, trial court initially awarded DCF temporary custody over L.B., M.B., and Y.B. while placing the children in Father's care. But the court's initial placement order hinged on Father's assertion that he had not used any illegal drugs recently except marijuana. So at the hearing, the court ordered Father to complete a uranalysis (UA) test to confirm his assertion. When Father's UA test results indicated that he had recently used marijuana, methamphetamines, and amphetamines, however, the court changed its placement order. It now ordered that the children be placed outside of Father's home.

After the children entered DCF custody, the trial court appointed a guardian ad litem (GAL) to represent them. Also, at this time, the court appointed Father, who had accepted family preservation services from DCF, an attorney. Then, KVC Health

Systems (KVC), the private agency that DCF contracted with to provide family preservation services, held Father's first permanency planning conference.

At this first permanency planning conference on October 4, 2016, Father agreed to weekly visitations in the home, office, or community for 60 minutes with the children. He agreed to give KVC the results of his September 23, 2016 Regional Alcohol and Drug Assessment Center (RADAC) test within 30 days. Also, he agreed to complete the following reintegration case plan tasks no later than March 23, 2016:  (1) to participate in outpatient drug services while following all outpatient drug services recommendations, (2) to complete a mental health assessment while following all mental health assessment recommendations, (3) to maintain stable housing while providing KVC with monthly rent and utility receipts, (4) to maintain stable employment while providing KVC with monthly paystubs, (5) to ensure anyone spending significant time around the children pass a background check, (6) to arrange a plan for licensed daycare for the children prior to their reintegration, (7) to complete a Love and Logic parenting class, (8) to avoid negative contact with law enforcement, (9) to complete random UA testing when requested, and (10) to not discuss the children's' custody cases in front of the children. Regarding the random UA testing, Father further agreed that KVC would consider any UA test that he refused or diluted as a UA test positive for illegal drugs.

Several days after this first permanency planning conference, the KVC caseworker assigned to manage L.B.'s, M.B.'s, and Y.B.'s cases, Billie Head, filed a report updating the trial court on the children's well-being and Father's progress completing his reintegration case plan tasks. In this report, Head stated that L.B., M.B., and Y.B. were all doing well at their out-of-home placement. She reported that according to M.E., their primary caretaker at their out-of-home placement, the children "begged" not to return to Father's home.

4

On the other hand, Head reported that so far, Father had made little progress on his reintegration case plan tasks. She noted that Father had completed a mental health assessment and avoided negative contact with law enforcement. But she stressed that Father had already missed his first outpatient drug service appointment scheduled on October 17, 2016, as recommended by his RADAC assessment. She explained that Father was unavailable for at least one of the random UA tests requested. And she explained that as of yet, Father had not given KVC any documentation related to setting up rent and utilities, obtaining employment, arranging for a licensed daycare, or completing the Love and Logic parenting class.

Regarding Father's house, in addition to noting that although it appeared that J.M. was now living with Father, Father had not requested a background check for J.M. Head noted that during her September 23, 2016 walk-through of Father's house, there was still no working electricity and water. She stressed that Father's house had "an offensive odor" with "clutter strewn throughout" to a "point there was no place to sit" in the living room or at the kitchen table. She pointed out that Father's upstairs "had dog feces on the floor and smelled strongly of urine." Also, while Head reported that Father's house was cleaner during her October 25, 2016 walk-though, she stressed that Father's house remained very messy. In particular, she noted that Father's bathroom and kitchen were "filthy and in need of being cleaned and sanitized."

Based on the preceding, Head concluded her report by asking the trial court to hold another custody hearing. Although Head still recommended that KVC try to reintegrate the children into Father's care and custody, she asked the court to order that the children remain in DCF custody and in out-of-home placement given Father's ongoing struggles completing his reintegration case plan tasks.

Eventually, on November 17, 2016, the trial court held a joint adjudication and disposition hearing on the children's cases where it adjudicated the children as children in

5

need of care (CINC) and found the Indian Child Welfare Act did not apply. According to the journal entry of the November 17, 2016 hearing, after Father stipulated to L.B., M.B., and Y.B. being children in need of care, the court found that clear and convincing evidence established that L.B., M.B., and Y.B. were children in need of care because they lacked adequate parental care and control. At this hearing, the court also approved and adopted the permanency plan that KVC and Father had completed on October 4, 2016. In all other ways, the court's orders on L.B.'s, M.B.'s, and Y.B.'s custody and placement remained the same.

*L.B.'s, M.B.'s, and Y.B.'s CINC Cases*

At the end of the November 17, 2016 adjudication hearing, the trial court set the children's CINC cases for a review hearing on February 16, 2017. Several days before that review hearing, Head filed another report with the court updating it on the children's well-being and Father's reintegration case plan tasks progress.

In her court report, Head explained that Father still struggled with his reintegration case plan tasks. She explained that although Father had completed his mental health assessment, he had not attended individual therapy twice monthly as recommended by this assessment since December 5, 2016. She explained that although Father had agreed to enter inpatient drug services on December 22, 2016, after showing up to his outpatient drug services appointment that day "under the influence of drugs," Father never returned for either outpatient or inpatient drug services. Relatedly, she explained that Father had submitted mixed UA test results. She reported that on January 3, 2017, Father's UA test result was negative for all illegal drugs. But she reported that on January 24, 2017, January 25, 2017, and January 30, 2017, Father "[a]ttempted and refused" to give a UA test. And on February 2, 2017, Father's UA test result indicated that he had recently used marijuana, methamphetamines, and amphetamines.

6

In addition, Head reported concerns about J.M.'s continued presence in Father's house. She noted that although KVC had provided Father with extra background check forms on January 12, 2017, for J.M. to fill out, KVC had still not received any background check requests from Father. Likewise, Head reported that Father had still not arranged daycare for the children.

In her court report, Head also noted Father had made some progress complying with his reintegration case plan tasks. She stressed that during her December 27, 2016 walk-through of Father's house, Father's house was "clean and organized" and "[t]here was food in the refrigerator and cabinets." And she explained that although Father had still not given KVC any documentation that he had employment or had taken the Love and Logic parenting class, Father now reported that he had a job "cutting wood" and that he had taken the parenting class.

Finally, although parts of Head's court report suggested that Father had complied with his case plan task to not discuss the children's custody cases with the children, Head's court report addressed what occurred immediately before Father's scheduled February 2, 2017 visitation time with the children. She explained that on that date, KVC asked Father to complete a UA test just before his visitation time with the children. It was KVC's procedure to make Father provide a negative UA test before allowing his visitation time with the children. Head reported that after Father learned KVC was cancelling his scheduled visitation time with the children because his UA test result was positive for marijuana, methamphetamines, and amphetamines, Father said and did the following in front of the children:

> "[Father] began screaming at [a KVC employee and] towards the children stating 'this [expletive deleted] is trying to keep me from seeing you girls. I'm going to sue KVC for this [expletive deleted].' [Father] got in [the KVC employee's] face and pointed his finger at her stating 'you have nothing on me to keep me from my girls you [expletive

deleted].' At this time the receptionist came into the room and asked [Father] to leave or she would call law enforcement to have him removed. [Father] left but screamed out '[expletive deleted] KVC and this [expletive deleted]. I'm going to sue that [expletive deleted] place and that [expletive deleted] for cheating me out of time with my kids."

Head then ended her report by emphasizing that given Father's conduct on February 2, 2017, KVC had concerns that Father suffered from underlying anger issues that adversely affected the children. She noted that when KVC asked M.E. on February 3, 2017, how the children were doing, M.E. said that "the girls did not sleep well . . . and told [her that] 'when daddy gets like this he snatches us up and we disappear.'" She explained that the children also told M.E. that they were afraid to go to school because they feared Father may try to kidnap them there, and then they would not "see anyone ever again."

At the February 16, 2017 review hearing, the trial court ordered that all of its prior orders on the children's custody cases remain in effect, including its order approving and adopting the KVC's October 4, 2016 permanency plan with Father. Afterwards, it scheduled the children's custody cases for a permanency hearing on August 3, 2017. Most importantly, though, at the hearing, the court ordered Father to provide a UA sample that day. Although not entirely clear from the record on appeal, it seems that because Father's February 2, 2017 UA test result indicated that he had recently used marijuana, methamphetamine, and amphetamine, the court wanted Father (1) to complete a second RADAC assessment and (2) to complete another UA test that day before leaving the courthouse. Regardless, Father ultimately refused to provide a UA sample as ordered by the court. So KVC continued to suspend Father's visitation time with the children until he could provide two negative UA tests.

Several days before the August 3, 2017 permanency hearing, the new KVC caseworker assigned to manage the children's CINC cases, Paul Henderson, updated the

8

trial court on the children's well-being and Father's progress on reintegration case plan tasks. According to Henderson's court report, the children were doing well and had made the school's honor roll. As for Father's reintegration case plan task progress, Henderson indicated that Father was making some progress. He noted that although Father had still not provided KVC documentation of his employment or income, Father reported that he remained employed cutting wood. He noted although Father had not provided KVC any documentation that he completed a second RADAC assessment, Father had been attending outpatient drug services, attending individual therapy, and complying with random UA requests. He explained that while Father had still "not researched day care" or requested any background checks, Father had abstained from negative contact with law enforcement. Also, he reported that since Father regained his visitation time with the children on May 11, 2017, after providing two negative UA tests, Father had not discussed the children's custody cases in front of them.

At the August 3, 2017 permanency hearing, the trial court found that the children's reintegration with Father remained a viable goal, ruled that its prior orders regarding the children's custody cases remain in effect, and ordered that another review hearing on the children's CINC cases occur on November 2, 2017. Upon Father's request, the court also ordered Father to complete a UA test "through Court Services" that day. Ultimately, Father's August 3, 2017 UA test result was negative for all illegal drugs.

Shortly before the November 2, 2017 review hearing, Henderson submitted another report updating the trial court on the children's well-being and Father's reintegration case plan tasks progress. In his report, Henderson asserted that although L.B., M.B., and Y.B. had some "sibling rivalry," they were largely doing well and all remained on the honor roll. He explained that Father continued to make some progress on his reintegration case plan tasks. For instance, he noted that Father reported that he was now helping with odd jobs on his landlord's rental property in exchange for the landlord paying his rent and utilities. He noted that there were now "no areas of concern" in

9

Father's house. And for this reason, he explained that Father's supervised visitation times were now occurring at Father's house, followed by 60 minutes of family therapy.

Henderson recommended that the children remain in DCF custody and in out-of-home placement. In making this recommendation, Henderson stressed that Father still had not requested a background check on J.M. although Father had married J.M. on October 12, 2017. J.M. was currently in jail on drug charges. Given Father's marriage to J.M., Henderson explained that KVC intended to amend the children's reintegration case plan tasks to include J.M.

At the November 2, 2017 review hearing, the trial court again ruled that its prior orders regarding the children's custody cases remain in effect. The court also appointed Karen Self, a Court Appointed Special Advocate, to represent the children. On this basis, before the next review hearing on January 18, 2018, both Henderson and Self filed reports with the trial court updating it on the children's well-being and Father's reintegration case plan tasks progress.

In her court report, Self gave new information about the children's well-being. She explained that L.B., as the oldest child, felt "pressure to 'put her family' back together." She stated that L.B. had told her that "she would like to go home to [Father]," but she did not want to spend time with J.M. L.B. told her that she feared Father would not be able to handle it if she and her sisters returned to his custody and then she and her sisters "would be separated." As for M.B., in addition to noting that M.B. "appear[ed] knowledgeable about drug issues," Self reported that M.B. was "very concerned with knowing the specific details about [Father's and J.M.'s] drug use" and was generally concerned whether Father's and J.M.'s drug use was why she and her sisters remained in DCF custody. Likewise, Self reported concerns with Y.B. because recently, she had been "struggling behaviorally with temper tantrums, hitting, [and] screaming." Self reported that Y.B. was "somewhat hesitant" about Father while being "very hesitant" about J.M.

10

Regarding Father's reintegration case plan tasks progress, both Henderson and Self explained in their respective reports that Father had regressed since the November 2, 2017 review hearing. For instance, Henderson explained that although Father said that he had completed the second RADAC assessment as ordered, Father had not provided KVC with any documentation of this. Relatedly, although Father was still participating in individual therapy, he was no longer attending any type of drug addiction related services. And Henderson explained that when he raised the issue of finding a licensed daycare for the children, Father told him that he was "not going to need daycare" because while he was at work, the children would be in school, and when the children were not in school, he would simply adjust his schedule.

Although Father still had not asked KVC to run a background check on J.M., Henderson explained that KVC decided to run one anyway. After doing this, KVC determined that J.M.'s criminal history meant that she could not be in Father's home until she passed a random UA test and attended drug treatment.

Despite KVC's ongoing concerns with J.M., Henderson stated that given Father's previous reintegration case plan task progress, KVC started allowing Father unsupervised weekend visitation time with the children in his home after the November 2, 2017 review hearing. But, Henderson went on to explain that KVC had cancelled all of Father's visitation times with the children since late December 2017 given the following information:

> "Visits were occurring over the weekend in the family home. [Father] had been producing two clean UA's in order to obtain these visits. During these visits, [Father] would help the girls with their homework . . . and prepare dinner for them. A weekend visit occurred December 8, 2017 through December 10, 2017. [The next weekend visit] occurred December 15, 2017 through December 17, 2017. On December 16, 2017, [a KVC social worker] made an unannounced visit to the home. [The KVC social worker] observed roaches in the home, sewage draining directly into the yard, broken glass

11

throughout the yard and alcohol and beer bottles throughout the yard. KVC had also received reports of [J.M.] being in the home and was even hiding out in the house and outside leaving out the back door until either the KVC [social] worker or [Self] had left the home. The extended visit for December 20, 2017 through December 27, 2017 was cancelled due to concerns of the condition of the home and due to concerns of [J.M.] being present without authorization.

"There were concerns about [Father] and [J.M.] flushing . . . their [UAs]. Due to this, KVC began sending [their UA] specimen[s] to the lab for testing. On December 20, 2017, this worker and the [KVC social worker] met with [Father and J.M.] . . . to discuss the concerns of the visits. Due to [J.M.'s] background checks having prohibitive offenses regarding substance use, [J.M.] could not attend visits until she . . . submit[ed] negative [UAs and] . . . work[ed] on [her] case plan tasks. A UA was obtained from [J.M.] and it was positive for methamphetamines. KVC had attempted to obtain a UA from [Father] prior to the meeting on December 20, 2017 but he was unable to provide a sample. After [Father] was informed [that] his visits would be returning to [] supervised [visits] in the KVC office, [Father] got upset and yelled at the [KVC social worker] and walked out. The visit scheduled for December 22, 2017 was cancelled due to [Father's] not cooperating with KVC. To date neither [Father] nor [J.M. have] produced a UA for KVC."

Based on Father's setbacks, both Henderson and Self recommended that the trial court change the goal of the children's custody cases from reintegration with Father to a concurrent goal of reintegration or adoption. The court followed Henderson's and Self's recommendation—"approv[ing] and adopt[ing KVC's] proposed permanency plan of reintegration/adoption" for the children's CINC cases at the January 18, 2018 review hearing. As with its prior review hearing orders, the court ordered that its previous orders regarding the children's custody cases remain in effect. Then, the court scheduled another permanency hearing on the children's custody cases for July 19, 2018.

Shortly before that hearing, both Henderson and Self once again filed reports with the trial court updating it on the children's custody cases. In their reports, both recommended that the court find that the children's reintegration with Father was no

12

longer viable. They explained that in addition to ongoing concerns about Father providing diluted UA samples, Father's March 16, 2018 UA test indicated that he had recently used marijuana, methamphetamines, and amphetamines, Father's March 22, 2018 UA test indicated that he had recently used amphetamines, and Father's June 27, 2018 UA test indicated that he had recently used methamphetamines. They also explained that given Father's failed UA tests, Father was unable to attend many of his scheduled visitation times with the children. Indeed, per their reports, it seems that between March 16, 2018—when Father failed his UA test—and June 14, 2018—when Father submitted his second consecutive negative UA test—Father had no visitation time with the children.

In their reports, Henderson and Self explained that Father had failed to comply with other reintegration case plan tasks as well. Henderson reported that Father had still not researched obtaining a licensed daycare for the children. Meanwhile, Self reported that she had learned from Father's individual therapist that he had not attended any sessions since December 14, 2017. Both Henderson and Self also reported that J.M. was not complying with her newly assigned reintegration case plan tasks. They explained that while J.M. had completed a RADAC assessment, she had not started drug treatment as recommended by the assessment. Similarly, both reported that J.M. continued to live in Father's home despite KVC's order prohibiting J.M. from having contact with Father until she submitted a clean UA and complied with her own reintegration case plan tasks.

At the July 19, 2018 permanency hearing, the trial court relied on Henderson's and Self's reports to find that DCF, via KVC, had made "reasonable efforts to assist and support [Father and the children] to accomplish [reintegration as] set out in the permanency plan." It further found that reintegration of the children with Father is no longer be a viable goal. It then directed the State to file a motion to terminate Father's parental rights over the children.

13

Eventually, the State filed its motion to terminate Father's parental rights over L.B., M.B., and Y.B. In its motion, the State argued that Father was presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6). While subsection (a)(5) stated that a parent was presumptively unfit if the child had been out of the parent's home for a total of at least one year and the parent "substantially neglected or willfully refused to carry out a reasonable [case] plan," subsection (a)(6) stated that a parent was presumptively unfit if the child had been out of the parent's home for at least two years and "there [was] a substantial probability that the parent [would] not carry out" the reasonable case plan "in the near future." The State asserted that Father's multiple violations of his reintegration case plan tasks and overall failure to assure the children's care in his home despite being able to do so since their removal from his care and custody in September 2016 established that he was presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6).

Once the State moved to terminate Father's parental rights, the trial court scheduled a hearing on the State's motion for February 21, 2019. But before this hearing occurred, the court held two additional review hearings on the children's custody cases on October 4, 2018, and on January 17, 2019, where it ruled that all its prior orders regarding the children's custody cases remain in effect. Although the court's orders from the preceding review hearings are of little importance to this appeal, the court reports filed by KVC and Self for those review hearings shed light on the children's well-being and Father's reintegration case plan tasks progress leading up to the February 21, 2019 termination of parental rights hearing.

Around the same time as the July 19, 2018 permanency hearing, KVC assigned a new caseworker, Jessica La Falce, to manage the children's custody cases. For this reason, La Falce filed the KVC's court report before the October 5, 2018 review hearing. In La Falce's report, although she pointed out that Father's August 9, 2018 and August 13, 2018 UA test results were positive for methamphetamines, La Falce asserted that Father

14

had made "improvements in many areas." She explained that when she last observed Father's house, it was "[safe] and appropriate." She implied that because Father's house was now safe and appropriate, KVC would allow Father to have supervised visits with the children in his house. She then reported that during Father's most recent visitation times, the children were "extremely happy" to see Father and Father parented appropriately. Also, she reported that although Father had not provided the KVC with any paystubs, McDonald's currently employed Father.

On the other hand, although Self agreed that Father's house was now safe and appropriate, she had greater concerns about the children's ongoing custody cases than La Falce. In her report, Self primarily stressed that none of the children felt safe with Father when he used drugs. She explained that L.B. had told her that she "would like to return" to Father's custody only if he stopped using drugs and J.M. was "not in the home" while M.B. and Y.M. had made comments about wanting safety and stability.

As for Father's interactions with the children, Self indicated that after the permanency hearing on July 19, 2018, KVC restarted weekly visitation time and family therapy. But she asserted that Father's conduct during the visitation time and family therapy was troubling because during that time:  (1) Father allowed many individuals, some of them unknown to the children, around the children; (2) Father discussed the possibility that his sister obtain custody of the children; and (3) Father forced the children to tell J.M. that they loved her over the phone. Although not entirely clear from her court report, it seems that Self took issue with Father's decision to allow other people around the children during visitation time and family therapy because Father's reintegration case plan task regarding background checks prohibited Father from allowing people who had not successfully completed a background check around the children. Likewise, it seems that Self took issue with Father's decision to talk about his sister obtaining custody of the children because Father's case plan task prohibited him from discussing the children's custody cases in front of them. Concerning Father's insistence that the children tell J.M.

that they love her, Self questioned Father's conduct because of the children's strained relationship with J.M. Self explained that both L.B. and M.B. refused to tell J.M. that they loved her. Conversely, Y.B. told Self that she had told J.M. that she loved her but only did so to please Father.

As for J.M.'s ongoing relationship with Father, Self noted that this was particularly problematic because J.M. was "currently incarcerated due to a probation violation." She explained that when she last spoke to Father, Father told her that J.M.'s probation officer had said that J.M. could live at his house until she was able to enter inpatient drug services. Yet, she explained that when she spoke to J.M.'s probation officer, J.M.'s probation officer had denied telling Father that J.M. could live in his house. At the same time, Self reported that Father's drug use remained a serious safety concern. She pointed out that although Father completed some paperwork to restart outpatient drug services, he neither called nor scheduled any appointments for outpatient drug services after attending a single appointment on August 23, 2018. Also, she reported that when she addressed Father's drug use with him, Father told her that he was "not addicted to methamphetamines and can quit whenever he wants." He alleged that methamphetamines did not affect his personality or parenting, telling Self that his "kids were always safe (even when using) . . . ." And he implied that he did not need to be a good role model for the children because "[k]id[s] are [going] to do what they are [going] to do."

Before the January 17, 2019 review hearing, KVC once again assigned a new caseworker, Christina Platt, to manage the children's custody cases. As a result, Platt and Self completed court reports updating the trial court on the children's well-being and Father's reintegration case plan tasks progress before the January 17, 2019 review hearing. Unlike La Falce's court report, however, Platt agreed with Self that Father had not made enough progress on his reintegration case plan tasks. Both Platt and Self mentioned that Father had not passed all of his UA tests. They reported that although KVC had tried multiple times to contact Father, Father was unavailable when KVC tried

16

UA testing on December 5, 2018, December 31, 2018, and January 4, 2019. Most significantly, they addressed Father's aggressive behavior at an early January 2019 family therapy session, which was attended by Father, L.B., and M.B.

According to Platt's and Self's court reports, the family therapist told them that during this early January 2019 family therapy session, Father started cursing in front of the children while complaining about KVC, Self, and the trial court. The therapist speculated that Father became angry because she would not allow J.M. to participate in the family therapy session. According to the therapist, Father had previously been told that J.M. was not allowed to attend family therapy with the children, but on that day, he had brought J.M. to the therapy session anyway. The therapist reported that as Father complained, he stated: "'I will get the children, or I will go to jail.'" Additionally, she explained that because of Father's needless aggressive behavior, she now understood why the children were afraid of Father. She noted that while Father told the children that he was not angry at them, his tone suggested that he was very upset. She reported that given this as well as Father's history of drug use, the children had "realistic fears" about returning to their Father's care or custody. She pointed out that L.B. and M.B. in particular "struggle[d] with trusting" Father because he had not "provid[ed] for them" in the past. She further asserted that Father needed professional help to control his anger issues.

Also, in their court reports, Platt and Self explained that immediately after the early January 2019 family therapy session, the children became scared that Father may "kill or hurt" anyone associated with their custody cases if his parental rights were terminated. Self reported that when she spoke to L.B. about the disputed session, L.B. told her that when she told Father his drug use scared her, Father responded that he could "'get high whenever [he] want[ed].'" Self reported that when she spoke to M.B. about the disputed session, M.B. was "frantic" because she heard Father say that he was "'going to 'F' some people up in the court room" and go "to jail if he loses his rights.'" Self

17

explained that now, M.B. had no desire to return to Father's care or custody. Instead, M.B. told her that she wanted to be adopted or be placed in a guardianship with "someone that daddy doesn't know." Self explained that although Y.B. did not attend the disputed family therapy session and appeared to enjoy her visitation time with Father, Y.B. had told her that she felt safe with Father only "sometimes" while she felt safe with M.E. "all [of] the time." And both Platt and Self reported that after visitation time with Father, Y.B. frequently "act[ed] out" for a few days.

In addition to filing court reports before the October 4, 2018 and January 17, 2019 review hearings, Platt and Self filed court reports for the February 21, 2019 termination of parental rights hearing. In those court reports, both asserted that the trial court should terminate Father's parental rights over the children because Father still struggled behaving appropriately and completing his reintegration case plan tasks. They explained that since the review hearing on January 17, 2019, Father did not actively participate in his visitation time with the children or family therapy. Both reported that the children had noticed that Father was acting distant and that this was distressing the children.

Meanwhile, Self reported that L.B. and M.B. still did not want to return to Father's care or custody. She explained that recently, M.B. explicitly stated that she never wanted to live in Father's home again because she was "scared of [Father]" given his frequent angry outbursts. She asserted that M.B. struggled emotionally because she feared that Father was choosing "[J.M.] and drugs" over her and her sisters. And she asserted that Y.B. expressed similar feelings. Self alleged that Y.B. had told her (1) that Father "only care[d] about drugs and [J.M.]" and (2) that she believed Father would "start doing drugs again" if she and her sisters returned to his care or custody. Also, Y.B. told Self that she "want[ed] to go home[,] but [she also did not] want to go home" because she feared Father "might do drugs and chase people down the road" like he had done before "when he was drunk."

As for Father's reintegration case plan tasks progress, Platt explained that Father had refrained from negative contact with law enforcement. She implied Father's failure to find a licensed daycare for the children was not currently an issue because "there [was] no need for childcare at this time" since Father only had supervised visits with the children once weekly for 60 minutes.

Even so, Platt mostly reported that Father had not complied with his reintegration case plan tasks. For instance, she explained that although Father's housing remained appropriate and KVC had previously confirmed that McDonald's employed Father, Father had still not given KVC any documentation related to how he was paying his rent and utilities, his employment, or his income. She explained that not only was Father's February 8, 2019 UA test result positive for marijuana, Father was not currently participating in any outpatient or inpatient drug services. She explained that given Father's apparent continued drug use, KVC wanted him to take a third RADAC assessment and follow this assessment's recommendations. She also pointed out that although Father had told KVC that he remained in individual therapy, KVC learned that Father was no longer attending individual therapy. In fact, it seems that although Father reengaged in individual therapy after he initially stopped attending it in December 2017, Father had not attended any individual therapy sessions since May 2018.

Lastly, although Platt recommended that the trial court terminate Father's parental rights, Platt explained that given Father's continued inappropriate behavior and drug use, KVC intended to update Father's reintegration case plan tasks to include new tasks at the next permanency planning conference on February 20, 2019. Those tasks included Father "taking accountability" for his drug use and anger. Also, one of Father's new tasks required him to "obtain and maintain legal transportation," including having a valid license, tags, and insurance. Nonetheless, when KVC held the permanency planning conference on February 20, 2019, Father refused to agree to the new reintegration case plan tasks. Although it is unclear exactly what happened, Platt later explained that the

conference "ended abruptly" after Father became very upset and angry. And Self alleged that Father had told her the new reintegration case plan tasks did not apply to him because he refused to sign the form agreeing to the new tasks.

*Father's Termination of Parental Rights Proceedings*

The next day—February 21, 2019—the trial court held the hearing on the State's motion to terminate Father's parental rights over L.B., M.B., and Y.B. At the start of the hearing, the State repeated its arguments within its written motion about Father being presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6). Father initially countered that he was not presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6). Yet, after hearing the parties' arguments, the court proposed an alternative plan, which Father agreed to as follows:

> "THE COURT: So[,] were you here earlier on another case that I called where the mother had stipulated to the Court's finding of unfitness and the presumption of unfitness, but I allowed that mother an opportunity to come back at a later time and rebut that presumption?
> "[FATHER'S ATTORNEY]: Yeah, Your Honor. I was here. We did that initially as well in which we discussed at that time how that would operate. If I could, I'd like to talk to [Father] about that option before we go forward with testimony today.
> "THE COURT: If you'd like for me to, I can take a couple minute recess.
> "[FATHER'S ATTORNEY]: If we could.
> . . . .
> "THE COURT: Let's take a 10 minute recess.
> "(Recess taken.)
> "THE COURT: We're back on the record . . . .
> "[FATHER'S ATTORNEY]: Your Honor, I think all parties are agreeing to the following. I think [Father] is going to stipulate that a presumption exists and that a Court could find that presumption; however, the second part . . . is whether his circumstances are likely to change in the future and we're going to reserve that for argument and ask for

20

a hearing on that issue in 60 to 90 days out and see how the case progresses in the meantime.

"THE COURT: State, are you in agreement?

"[STATE'S ATTORNEY]: Judge, we are in agreement with the following caveat that . . . [F]ather has not provided the sample for the UA the judge ordered and that he is going to provide a sample before he leaves today, even though he stipulated today. Furthermore, he has to understand that one of our greatest concerns is his drug use, his alleged drug use. And I just want the Court to be aware that if he's going to go to drug and alcohol intake *and say I don't use drugs and they recommend no action, it's just not going to cut it in my eyes*. And so, we fully expect that if we are going to do this, he's going to acknowledge his drug use and he's going to make attempts to address that. Lastly, it is my position that if he can complete the inpatient program and you can work on transition back home [within] . . . 60 days, he needs to start dealing with those issues. . . .

"THE COURT: [Father's attorney,] I want to make it clear that what [Father] is doing today is he is stipulating to the facts that are alleged in the motion for the finding of unfitness, including the presumption, correct?

"[FATHER'S ATTORNEY]: That's correct, Your Honor.

"THE COURT: You're just asking the Court to set it out then for him to rebut the presumption, correct?

"[FATHER'S ATTORNEY]: *That's correct. I think the part we want a chance to rebut is whether his circumstances are likely to change in the near future.*

"THE COURT: And [Father], you told me earlier that you are going to be clean, correct?

"[FATHER]: Yes, I just gave [a clean UA] yesterday.

. . . .

"THE COURT: Is that accurate? Does anybody know?

"[STATE'S ATTORNEY]: Judge, it takes a lot of UAs. The allegation is that most of them are diluted, so whether he passed one yesterday doesn't convince me that he's clean, though.

"THE COURT: Yeah, I'm interested, though, when he indicated [that] he gave one yesterday. I am going to order, [Father], that before you leave [the courthouse] . . . you'll provide [a UA]. [GAL], is there something you want to state for the record?

"[GAL]: I do, Your Honor. I view the stipulation [as] in the kids' best interests, as well. But I would ask the Court because of the continuing issues with the quality of the [UA] sample, the dilution of the [UA] sample, the results of the [UA] sample, I would ask [that] the Court order that he be administered a hair follicle test. . . .

"THE COURT: And the KVC be ordered to pay for it?

"[GAL]: Yes, Your Honor.

"THE COURT: Is that possible to do a hair follicle test?

"KVC WORKER: We've done it before, Your Honor, and it has been back in three days.

. . . .

"THE COURT: Okay. Well, so [Father], your attorney tells me that you are stipulating. That means that you agree that the facts alleged in the State's motion for finding of unfitness and termination of parental rights are true and that the presumption applies; however, your attorney is asking me to set this out for a later date for you to show that basically you are complying with your case plan tasks, and then I'm going to enter other orders here than that. So is that what you want to do today?

"[FATHER]: Yeah.

"THE COURT: Okay. You've read the State's motion for finding of unfitness and termination of your rights, correct?

"[FATHER]: Yeah, yeah.

"THE COURT: So you understand what you are stipulating to; is that correct?

"[FATHER]: Yes.

"THE COURT: Okay. All right. I'll accept the father's stipulation to the facts alleged in the motion of finding of unfitness. And you believe, [GAL], it's in the best interests for the Court not to make a determination of the parental rights finding today, but to set it out for about 60 days to allow [Father] to comply with his case plan and to rebut that presumption?

"[GAL]: Yes, Your Honor.

"[STATE'S ATTORNEY]: May I make a record, Judge?

"THE COURT: Yes.

"[STATE'S ATTORNEY]: I would ask that you find that he has—and you've already found he has stipulated. I would ask that you find that the facts, therefore, are true, and finally, that they provide clear and convincing evidence for unfitness, and in addition to that, that the presumption applies, but hold in abeyance making the finding

22

that the conduct and condition is unlikely to change in the foreseeable future and hold in abeyance an opportunity to rebut the presumption. Two different things.

"THE COURT: And in fact, that will be the Court's finding today and order of Court. I'm also going to order today that [Father] provide a UA before he leaves, direct the DCF and KVC contractor to do a hair follicle test. I'm going to order, [Father], that you obtain a substance abuse evaluation and follow those recommendations, whatever they are. I'm going to also order that KVC do regular UAs on [Father] so that we have a good track record when we come back in in approximately 60 days. Also, [Father], are you in any kind of individual counselling currently.

"[FATHER'S ATTORNEY]: He's going next week.

. . . .

"THE COURT: I'm going to order that you comply with that.

"[FATHER]: Okay.

"THE COURT: Is there any family counseling going on at all?

"[STATE'S ATTORNEY]: There is, Judge. I would submit to you that [] counselor is here today and she would have testified that he is not actively participating, and that's part of this.

"THE COURT: Yeah, and I'm going to order that you participate in this family counseling. Let me tell you something, [Father]. We don't want to terminate your parental rights. We really don't. I want you to raise your own kids and that's the law, but at some point, these cases can't stay open forever, and on your daughters, these cases have been open too long. I'm giving you another chance. What's extremely important is that when you talk to your girls, like in family counseling and whatever type of visitations that you're going to get, that you don't talk about this case, you know, this termination of your parental rights. That's your opportunity to love your kids and show affection. So don't be saying anything inappropriate that might upset them, you understand that, because some of these reports have said some of the statements you have made cause them concerns. They are just kids. They need to be talked to by their parent about how school's going, what activities you're doing, and show love and affection and not in any way try to upset them.

"So what we've got then is an order for substance abuse evaluation, follow those recommendations, continue with family counseling and individual counseling, regular UAs—you are going to give one today—and a hair follicle test." (Emphasis added.)

23

After having the preceding discussion and entering the preceding orders, the trial court scheduled the second part of Father's termination of parental rights hearing, which would solely concern whether Father could rebut his presumption of his unfitness under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6), for April 4, 2019. Of note, the UA test Father completed before leaving the courthouse on February 21, 2019, was negative for all illegal drugs.

Before the second part of Father's termination hearing on April 4, 2019, Platt and Self filed yet another report with the court updating it on the children's well-being and Father's reintegration case plan tasks progress. In essence, Platt and Self explained that L.B.'s, M.B.'s, and Y.B.'s feelings about Father, J.M., and their drug use remained the same. None of them wanted to return to Father's care or custody because they were afraid of Father. Significantly, in her court report, Self noted that since the first part of Father's termination of parental rights hearing, L.B. revealed (1) that Father sometimes left her in charge of her sisters for "days" when they had no food or water and (2) that Father once left her with an uncle who "sexually molested her." Self explained that when she confronted Father about L.B.'s sexual molestation revelation, Father confirmed that this uncle had sexually molested L.B. and then told her that had he "been in prison the same time as [L.B.'s uncle, L.B.'s uncle] wouldn't be alive today" because "'[c]hild molesters don't deserve to live.'"

Likewise, Self reported that when she confronted Father about the children being afraid of him, Father responded:

> "'They've seen me beat people up. I hide nothing from my kids, that's just part of life. You're white, I'm Native American, it[']s just the way life is. They are going to see it. It happens in life. I was beaten to a bloody pulp as a child by my step-dad. I had third degree burns all over my body as a baby. That's just the way things are.'"

24

Platt's and Self's court reports also pointed out that Father had attended only two of his five scheduled visitation times with the children since the first part of his termination hearing. They explained that during those two visitation times, Father had "little interaction" with the children. Also, they explained that Father lost the other three scheduled visitation times for two reasons: (1) because Father's UA tests on March 5, 2019, and on March 13, 2019, were lab-confirmed positive for marijuana and (2) because Father failed to complete the hair follicle test before March 23, 2019—the latest possible date he could take the hair follicle test and still have the results in time for the second part of his termination hearing on April 4, 2019.

Regarding the hair follicle test specifically, Platt and Self stressed that Father failed to complete the hair follicle test (1) although KVC had paid for the test, (2) although Father had been given all the information necessary to timely complete the test, and (3) although Father had been given two gas cards so he could reach the hair follicle testing facility in Overland Park, Kansas, at no cost. Platt also emphasized that she repeatedly texted Father about timely completing his hair follicle test after the first part of his termination of parental rights hearing. She noted that although Father had texted her back a couple times that he was having trouble finding a car ride, Father had recently received other car rides to places outside of Fort Scott. She explained that Father routinely traveled from his house in Fort Scott, to visit J.M. at her inpatient drug treatment facility in Pittsburg, Kansas.

Relatedly, Platt reported that although Father arrived at the facility to take his third RADAC assessment as ordered by the trial court, Father never actually completed it because he refused to be assessed for inpatient drug services. Although not entirely clear from the record on appeal, it seems that Father decided against taking the third RADAC assessment after the person who was going to assess him said that there was no point in him taking it if he was unwilling to be assessed for inpatient drug services. In any case, Platt explained that after refusing to be assessed for inpatient drug services, Father

25

attended just one outpatient drug services appointment thereafter. And she explained that since the first part of his termination of parental rights hearing, Father had attended just two sessions with his individual therapist and had refused to seek therapy from an anger management specialist.

As for Father's other reintegration case plan tasks, Platt again reported that Father refrained from negative contact with law enforcement. But she otherwise asserted that Father had failed to fully comply with his reintegration case plan tasks. She noted that although Father's housing appeared appropriate and KVC had previously confirmed that McDonald's employed Father, Father had still not given KVC any documentation related to how he was paying his rent and utilities, his employment, or his income. She noted that throughout the children's custody cases, Father never submitted any background checks. And Platt explained that when she raised the issue of finding a licensed daycare with Father, Father was unable to "understand why the girls [could not] stay at home by themselves."

Before the second part of his termination hearing, Father did not file a written response to the State's motion to terminate his parental rights to attempt to rebut the presumption of his unfitness under K.S.A. 2020 Supp. 38-2271(a)(5) or (a)(6). Likewise, at the outset of the second part of his termination hearing, Father did not make arguments rebutting the presumption of his unfitness under K.S.A. 2020 Supp. 38-2271(a)(5) or (a)(6). Instead, it seems the only argument Father made rebutting his presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6) occurred at the end of the second part of his termination hearing, when Father's attorney asserted:

> "The Court is well aware of the issues. I guess we would just argue that [Father] has completed many of his case plan tasks and is in significant compliance with those not completed. He has met his burden of showing that his condition has changed. [And that it is] likely to change in the foreseeable future."

26

Otherwise, Father relied on the testimony of himself and of the children's former caseworker, La Falce, to rebut his presumptive unfitness. The State, on the other hand, countered Father's evidence with Platt's testimony. And at the end of this second hearing, the trial court took the matter of whether to terminate Father's parental rights under advisement.

During his testimony, although Father initially testified that he was "kind of" aware that he had reintegration case plan tasks, he later asserted that he had completed all of them. Father testified that although he had used marijuana previously, he had not used it in the past two years. He alleged that the only reason why some of his UA tests within the past two years were positive for marijuana was because he continued to spend time around friends while they smoked marijuana. He testified that he had not used any methamphetamine since September 2018, nearly seven months. Also, he testified that although J.M., who he would "most likely" end his relationship with, was addicted to drugs, he did not have a "drug problem."

Father further testified that he complied with his reintegration case plan tasks: (1) to complete background checks for all persons who spent significant time around the children and (2) to find a licensed daycare. He asserted that he complied with his background checks case plan task because nobody ever came over to his house and spent significant time around the children. Yet, he later implied that he never turned any background checks into KVC because there was never a point where the children were close to being returned to his care or custody. At the same time, though, Father testified that at some point when he "felt that [he was] close to getting the children back home," he "look[ed] around" for daycare and asked "[t]he people who live across the street" who operated a daycare if they "could keep [the children] for a couple of hours." Then, he testified that he had no concern about finding a licensed daycare should the children return to his care or custody because he would simply adjust his work schedule.

27

As for his failure to complete the hair follicle testing as ordered by the trial court, Father testified that he could not drive himself to the testing facility in Overland Park because he did not have a working car. Although he acknowledged that KVC gave him two gas cards, he testified that he asked "multiple people" on "multiple occasions" for a car ride but was still unable to reach the testing facility in Overland Park. He alleged that his male cousin tried driving him to the testing facility "twice" but had car troubles that prevented them from reaching the facility both times. Also, although he admitted that he sometimes traveled to Pittsburg, he alleged that his "mentally handicapped nephew," who was incapable of driving as far as Overland Park, drove him there.

Meanwhile, La Falce testified that when she was the managing caseworker for the children's custody cases from around early July 2018 to early November 2018 when she quit working at KVC, she believed that Father "always" acted appropriately around the children and actively worked towards reintegration. She testified that although Father's drug use was an issue in the case, she believed that Father could parent the children appropriately even when he was "actively using methamphetamine." She stated that Father not only "put his best effort towards completing his case plan" tasks, but also his parenting skills were the same when she "was getting positive UAs versus [when she] was getting negative UAs." She suggested that Father's failure to search for a licensed daycare for the children was irrelevant "because the children were not close to returning" to Father's care or custody. She also testified that she believed that "KVC ha[d] a duty to provide [Father] transportation" to the hair follicle testing facility in Overland Park.

In contrast, when testifying on the State's behalf, Platt explained that she believed Father intentionally evaded completing his reintegration case plan tasks. It was her opinion that Father never tried complying with his case plan tasks related to his ongoing drug use because Father believed that he did not have a drug problem. She stressed that the case plan task about finding a licensed daycare was particularly important in the children's custody cases because of their specific needs, which included aggressive

28

behavior and sibling rivalries. And she explained that in addition to repeatedly sending Father reminder texts about completing the hair follicle test no later than March 23, 2019, Father never directly asked KVC for a ride. Instead, he told her that "he was working on his own transportation." She further alleged that Father never told her that he lacked transportation to get to the hair follicle testing facility in Overland Park until after the March 23, 2019 deadline had passed.

*The Trial Court's Decision*

After taking the matter under advisement at the end of the second part of Father's termination of parental rights hearing, the trial court issued an order terminating Father's parental rights over L.B., M.B., and Y.B. on May 1, 2019. In its order, the court noted that the children were removed from Father's custody on September 14, 2016, and were adjudicated as children in need of care on November 17, 2016, meaning the children had been in out-of-home placement for about 31 months. The court found that this was "unacceptable" and "directly related to [Father's] failure to refrain from using illegal drugs and failure to complete his case plan tasks within a reasonable period." It then pointed out that although Father had "reengaged in some of the required case plan tasks" since the first part of his termination of parental rights hearing on February 21, 2019, Father's efforts during this period were not enough to rebut the presumption of his unfitness under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6). It found that during the duration of the children's custody cases, the only improvement Father made was getting his house in a livable condition and obtaining employment.

Although the trial court noted that Father refrained from negative law enforcement contact, there was insufficient evidence regarding whether Father complied with his case plan task regarding background checks, and that that there was insufficient evidence regarding whether Father complied with his case plan task regarding discussing the children's custody cases in front of them. The trial court found that Father had otherwise

"failed to substantially comply with his case plan goals." The trial court also noted that all current KVC staff, Self, and the GAL asserted that termination of Father's rights was in the children's best interests, before then finding that the facts of the children's CINC cases established that termination of Father's parental rights was in the children's best interests.

Father now timely appeals the termination of his parental rights over L.B., M.B., and Y.B. The children's custody cases have been consolidated for appeal.

ANALYSIS

*Did the trial court err when it terminated Father's parental rights?*

On appeal, although Father's appellate arguments blend together, it seems that Father believes that the trial court erred when it terminated his parental rights over L.B., M.B., and Y.B. for three reasons. First, Father argues that the court could not properly terminate his parental rights because his reintegration case plan tasks in the children's custody cases were unreasonable. Father argues that the court erred because it approved and then terminated his parental rights based on unreasonable reintegration case plan tasks. Second, he argues that clear and convincing evidence did not support the court's finding that he failed to rebut his presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6). Third, he argues that clear and convincing evidence did not support the court's finding that termination of his parental rights was in the best interests of L.B., M.B., and Y.B.

In its brief, the State responds that Father's first argument is meritless because Father stipulated to being unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6). It next argues that despite Father's assertion otherwise, when viewed in the light most favorable to it, a reasonable fact-finder could have concluded that he did not rebut his presumption of unfitness. In making this argument, the State emphasizes that the children remained

30

out of Father's care and custody for about 31 months, while also asserting that Father never adjusted his circumstances to their needs. For this same reason, the State correctly states that the correct standard of review for the best interests finding is abuse of discretion and argued the trial court's finding that termination of Father's parental rights was in the children's best interests was reasonable.

*Applicable Law*

K.S.A. 2020 Supp. 38-2269(a) states that after the trial court has adjudicated a child as a child in need of care, the court may terminate a parent's rights over the child if it "finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." Although subsections (b) and (c) of K.S.A. 2020 Supp. 38-2269 list factors that the court should ordinarily consider when considering whether a parent is unfit, the court does not have to consider those factors if the parent is presumptively unfit as stated under K.S.A. 2020 Supp. 38-2271(a). And as previously noted, in this case, the court found Father presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6) after Father stipulated to his unfitness under those subsections. Because the statutory requirements of (a)(6) are more the stringent of the two statutes, we limit our review to that statute.

To review, K.S.A. 2020 Supp. 38-2271(a)(6) provides:

"It is presumed . . . that a parent is unfit by reason of conduct or condition which renders the parent unable to fully care for a child, if the state establishes, by clear and convincing evidence, that:

"(6)(A) the child has been in an out-of-home placement, under court order for a cumulative total period of two years or longer; (B) the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the

31

parental home; and (C) there is a substantial probability that the parent will not carry out such plan in the near future."

After the trial court has found a parent presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(6), then K.S.A. 2020 Supp. 38-2271(b) requires the parent to "rebut the presumption of unfitness by a preponderance of the evidence." K.S.A. 2020 Supp. 38-2271(b) further provides that if the parent fails to rebut the presumption of unfitness by showing either a present fitness to parent or an ability to become fit and "care for the child in the foreseeable future," then the court "shall" terminate the parent's rights.

Yet, even when the trial court finds a parent presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(6), the court must still consider whether termination of the parent's rights is in the child's best interests under K.S.A. 2020 Supp. 38-2269(g)(1). See *In re K.P.*, 44 Kan. App. 2d 316, 320-21, 235 P.3d 1255 (2010) (explaining that a trial court must still comply with K.S.A. 2020 Supp. 38-2269[g][1]'s best interests of the child finding-requirement after the court has found the parent presumptively unfit under K.S.A. 2020 Supp. 38-2271). K.S.A. 2020 Supp. 38-2269(g)(1) states:

> "If the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order."

When parents challenge the termination of their parental rights, this court "'consider[s] whether, after review[ing] of all the evidence, viewed in the light most favorable to the State, . . . a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent[s'] rights should be terminated." *In re K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018). While engaging in this review,

this court must not reweigh the trial court's findings on conflicting evidence or reassess the trial court's credibility determinations. 56 Kan. App. 2d at 445. Conversely, when parents challenge the trial court's best interests of the children finding, this court reviews that finding for an abuse of discretion and ensure the trial court's determination is supported by a preponderance of evidence. A trial court abuses its discretion "if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue." *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019). Also, whether an issue is properly before this court constitutes a question of law over which this court exercises unlimited review. *State v. Daniel*, 307 Kan. 428, 429-30, 410 P.3d 877 (2018); see *State v. Haberlein*, 296 Kan. 195, 203, 290 P.3d 640 (2012) (noting that appellate courts exercise unlimited review over preservation issues).

*Case Plan Task Complaints Waived*

As outlined in the facts section of this opinion, during the first part of Father's termination of parental rights hearing on February 21, 2019, in addition to ordering that he comply with his other reintegration case plan tasks, the trial court ordered Father (1) to complete a third RADAC assessment and follow its recommendations, (2) to return to individual and family therapy, and (3) to take a hair follicle test. And at this hearing, Father stipulated that he was presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(6) as alleged in the State's motion to terminate his parental rights over the children.

In his brief, Father stresses that under K.S.A. 2020 Supp. 38-2271(a)(6), the trial court could not find him unfit unless he failed to carry out a "reasonable" reintegration case plan. He then argues that the court's finding that he was presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(6) was erroneous because the reintegration case plan tasks "adopted by the [trial] court [were] not reasonable." For instance, he complains that his

33

reintegration case plan task to find a licensed daycare for the children was unreasonable because he only had limited visitation time with the children during the 31 months they were out of his care and custody. Similarly, he complains that the trial court's orders about following the recommendations of a third RADAC assessment, about returning to individual and family therapy, and about taking the hair follicle test were unreasonable because the court expected him to "complete" the recommendations of a third RADAC assessment, individual therapy, and family therapy between the first and second parts of his termination hearing. As for the hair follicle test, Father argues that this order was unreasonable because he lacked transportation to the testing facility in Overland Park.

Nevertheless, Father's arguments about the reasonableness of his reintegration case plan tasks are plainly problematic. To begin with, before the trial court, Father never challenged the reasonableness of his reintegration case plan tasks or the orders that the court added to his reintegration case plan tasks at the first part of his termination hearing on February 21, 2019.

It is a well-known rule that generally, issues not raised before the trial court cannot be raised to this court for the first time on appeal. *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016). Although there are a few exceptions to this general rule, a party must invoke one of those exceptions for it to apply. See *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008). Also, Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 35) requires an appellant raising an issue for the first time on appeal to explain why the issue should be considered despite appellant's failure to make the argument before the trial court. And by violating Rule 6.02(a)(5), an appellant risks this court ruling that the newly raised issue is improperly briefed and thus waived and abandoned. *Daniel*, 307 Kan. at 430.

In short, because Father never challenged the reasonableness of his reintegration case plan tasks while before the trial court, for us to properly consider Father's arguments

for the first time on appeal, Father needed to invoke one of the exceptions allowing him to make his arguments for first time on appeal. By not doing this, Father failed to preserve any arguments about the reasonableness of his reintegration case plan tasks. Likewise, by never recognizing in his appellant's brief that he is raising his complaints for the first time on appeal, Father has violated Rule 6.02(a)(5). In turn, Father's arguments about the reasonableness of his reintegration case plan tasks are improperly briefed and thus waived and abandoned. *State v Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019) (Issues not adequately briefed are considered waived or abandoned.).

More fundamentally, though, Father's arguments about the reasonableness of his reintegration case plan tasks ignores that before the trial court, he agreed that those tasks were reasonable. Under K.S.A. 2020 Supp. 38-2271(a)(6), the State must prove three elements to establish a parent's presumptive unfitness. The second element specifically requires the State to establish that the parent "failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home." K.S.A. 2020 Supp. 38-2271(a)(6)(B). So by stipulating that he was presumptively unfit as meant under K.S.A. 2020 Supp. 38-2271(a)(6), *Father necessarily stipulated to the reasonableness of the reintegration case plan that the trial court approved and that he failed to carry out*. Also, because the presumption of Father's unfitness was derived from the evidence outlined in the State's termination of parental rights motion, which indicated that Father was presently unfit to parent and unlikely to become fit to parent in the near future, Father's presumption of unfitness continued to run against him regardless of his current arguments otherwise. See K.S.A. 60-414(a) (stating that "if the facts from which the presumption is derived have any probative value as evidence of the existence of the presumed fact, the presumption continues to exist and the burden of establishing the nonexistence of the presumed fact is upon the party against whom the presumption operates").

In summary, Father's complaints ignore that he stipulated to the reasonableness of his reintegration case plan tasks. With that in mind, even assuming Father's case plan tasks were unreasonable, he invited this error by stipulating that his case plan tasks were reasonable. See *Water Dist. No. 1 of Johnson Co.*, 304 Kan. at 618 (holding that party who invites error cannot complain about that error on appeal). Thus, regardless of the preservation problems previously discussed, because Father stipulated to the reasonableness of his reintegration case plan tasks, he cannot successfully argue that the trial court wrongly terminated his parental rights based on the unreasonableness of his reintegration case plan tasks.

*Rebuttable Presumption Findings Adequate*

To review, in its termination order, the trial court concluded that Father failed to rebut his presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(6) for three reasons: (1) because the children had been out of Father's care and custody for about 31 months, (2) because of Father's failure to refrain from using illegal drugs, and (3) because of Father's failure to complete his reintegration case plan tasks "within a reasonable period." Although the court noted that Father had reengaged in some of the required case plan tasks since the first part of his termination hearing, it found that those efforts were inadequate to rebut the presumption of unfitness. Also, it stressed that during the course of the children's custody cases, the main reintegration case plan tasks that Father somewhat complied with were getting his house in a livable condition and obtaining employment.

In his brief, Father contends that clear and convincing evidence did not support the trial court's finding that he failed to rebut the presumption of his unfitness under K.S.A. 2020 Supp. 38-2271(a)(6) by a preponderance of the evidence. According to Father, during the rebuttal portion of his termination hearing, he established that he had "consistently work[ed] his [reintegration] case plan" tasks. He established that he was

"highly involved and active" with the children during visitation times. And he established that "he had corrected his housing situation" and had employment at McDonald's. Father asserts that because he established the preceding, he also rebutted his presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(6). In challenging the court's finding that he did not rebut his presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(6), Father also argues that the court ignored the progress that he made between the first and second parts of his termination hearings while overemphasizing his UA test results and failure to complete the hair follicle testing.

Nevertheless, it is readily apparent that clear and convincing evidence proved that Father was not presently fit to parent and was unlikely to become fit to parent in the foreseeable future. In this case, it is undisputed that the children remained out of Father's care and custody for over 31 months. As the trial court pointed out in its termination order, during that time, Father improved the condition of his house and got a job at McDonald's. Then, during the time between the first and second parts of his termination hearing, between February 21, 2019, and April 4, 2019, Father "reengaged in some of the required case plan tasks." But outside of this progress, Father did very little over the course of the children's custody cases to improve his parenting abilities.

Father contends that the trial court overemphasized his UA test results and his failure to complete hair follicle testing. Nevertheless, the record shows that the major concern during Father's reintegration case plan was his continued drug use. Again, Father admitted that he used methamphetamine as late as September 2018. While Father now asserts that the court ignored the progress that he made between the first and second parts of his termination hearing, his argument ignores his UA tests on March 5, 2019, and on March 13, 2019, were lab-confirmed positive for marijuana. Thus, the evidence before the court showed that even after being given the opportunity to make progress on his reintegration case plan tasks between the first and second parts of his termination hearing, Father continued to use drugs.

37

And so, even if we were to assume for argument's sake that KVC should have done more to get Father to the hair follicle testing facility in Overland Park, the evidence indicated that Father continued to use drugs just weeks before the rebuttal portion of his termination hearing. Also, because Father had to pass his UA tests to obtain visitation time with the children, Father's positive UAs resulted in Father losing three of his five visitation times with the children between the first and second parts of his termination hearing. Thus, the evidence before the trial court showed that Father continued to choose drugs over spending time with the children. And, it is also worth noting that Father's testimony about why he was unable to reach the hair follicle testing facility in Overland Park was inconsistent with his text messages to Platt about why he was unable to reach the testing facility. Although Father testified at his termination hearing that it was a male cousin who had car problems during his two attempts getting a ride to the testing facility in Overland Park, his texts to Platt indicated the person who had car problems during his two attempts getting a ride to the testing facility in Overland Park was female.

On top of this, Father ultimately decided against taking his court-ordered third RADAC assessment because he was told by the person who was going to assess him that there was no point in taking it a third time since he refused to be assessed for inpatient drug services. Thereafter, Father attended only one outpatient drug services session between the first and second parts of his termination hearing. Also, although Father testified that he would likely end his relationship with J.M., Father's undisputed continued contact with J.M. strongly suggested that he would remain in a relationship with J.M. despite her ongoing drug addiction issues. Simply put, the preceding evidence regarding Father's ongoing drug problems constituted clear and convincing evidence that Father's ongoing drug problems made him presently unfit and unlikely to become fit in the foreseeable future.

Although Father alleges that he consistently worked his reintegration case plan tasks and was active and involved with the children during his visitation time, this

assertion relies on the testimony of La Falce. While La Falce believed that Father's reintegration case plan tasks progress was adequate, Platt—the children's current caseworker—did not. Again, contrary to La Falce's testimony, Platt testified that she believed Father intentionally evaded completing his reintegration case plan tasks. And, Platt's and Self's court reports for the April 4, 2019 rebuttal portion of Father's termination hearing detailed Father's continued issues in failing to comply with his reintegration case plan tasks. Indeed, Platt's court report stated that the only reintegration case plan task that Father was currently in full compliance with was refraining from negative contact with law enforcement. She noted that since his first termination hearing, Father had attended just two individual therapy sessions, had refused to seek therapy from an anger management specialist, had not provided the KVC any documentation related to how he was paying his rent and utilities, and had not provided KVC any documentation related to his employment or income.

In addition, Father's comments to Self between the first and second parts of his termination hearing about L.B.'s sexual molestation and about exposing the children to violence provided further support for the trial court's finding that Father failed to rebut his presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(6). When Self confronted Father about L.B.'s recent revelation that an uncle sexually molested her, Father not only confirmed that an uncle had sexually molested L.B, but he also told Self that if he had been in prison at the same time as this uncle, he would have murdered him. Then, he told Self that he was not going to hide anything from the children, including him "'beat[ing] people up,'" because "'that's just a part of life.'" In short, these comments established that Father did not believe that he had an anger problem, which in turn meant that Father's anger issues would remain a problem that prevented him from properly parenting the children in the foreseeable future. The best indicator of future performance is past performance. Accordingly, courts can consider a parent's past conduct as evidence regarding the reasonable likelihood of any future change in parental fitness. See *In re*

39

*M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 944 (2019); *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

So although Father argues that clear and convincing evidence does not support the trial court's finding that he failed to rebut his presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(6) by a preponderance of the evidence, Father's argument is flawed. It hinges on ignoring the evidence establishing that he was presently unfit to parent and unlikely to become fit to parent in the foreseeable future. It also hinges on La Falce's testimony, which the court plainly rejected by terminating Father's parental rights over the children. See *In re K.L.B.*, 56 Kan. App. 2d at 445 (holding that this court does not reweigh the trial court's credibility determinations under the clear and convincing evidence standard of review). Thus, Father's argument is fatally flawed because the trial court correctly found that he failed to rebut his presumption of unfitness under K.S.A. 2020 Supp. 38-2271(a)(6). As a result, we find that the district court's conclusion regarding Father's future unfitness is supported by clear and convincing evidence.

*Best Interests of the Children Findings Adequate*

In the trial court's termination order, after it noted (1) that the children had been out of Father's placement and custody for about 31 months, (2) that Father had not completed most of his reintegration case plan tasks, and (3) that all current KVC staff, Self, and GAL testified that termination of Father's rights were in LB.'s M.B.'s, and Y.B.'s best interests, it found that the facts presented during the termination hearing established that termination of Father's parental rights was in the children's best interests.

In his brief, Father fails to correctly identify the burden of proof, and the standard of judicial review, for the best interests finding. He has failed to adequately brief or argue the issue beyond a simple allegation against the court. Father has therefore waived and abandoned this issue. *Salary*, 309 Kan. at 481 (Issues not adequately briefed are

considered waived or abandoned.). However, because the right to parent one's own child is a fundamental constitutionally protected interest, we choose to review this issue. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (citing *Santosky*).

In his final argument, Father asserts that clear and convincing evidence does not support the trial court's finding that termination of his parental rights was in the children's best interests. He complains that the court's best interests finding was inadequate because it "offers no comment on how it analyzed the evidence to determine the impact of severance on the physical, mental [and] emotional health" of the children.

K.S.A. 2020 Supp. 38-2269(g)(1) provides that after the trial court finds a parent unfit, it "shall consider whether termination of parental rights . . . is in the best interests of the child." Father's argument that the best interests finding must be based upon clear and convincing evidence is incorrect. After making a finding of unfitness, the district court must consider whether termination of parental rights is in the best interests of the child supported by a preponderance of evidence and reviewed for an abuse of discretion. K.S.A. 2020 Supp. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d at 1115-16.

Previously, our Supreme Court has remanded a parent's appeal from the termination of that parent's rights when "it [was] not apparent from the record on appeal" that the trial court made the statutorily required best interests of the child finding. *In re K.W.*, 45 Kan. App. 2d 353, 353, 246 P.3d 1021 (2011).

Here, although Father correctly points out that the trial court's best interests of the children finding is brief—it merely found that "it [was] in the best interest of the minor children to terminate and sever the parental rights of the natural father," the trial court did make a best interests of the children finding. And, unlike the preceding Supreme Court

41

case, it is readily apparent from the record on appeal that the trial court in Father's case made the statutorily required best interests of the children finding.

There are problems with Father's argument that the trial court's best interests of the children finding did not adequately consider the children's physical, mental, and emotional health. For starters, although the trial court's termination order does not explicitly mention L.B.'s, M.B.'s, or Y.B.'s physical, emotional, or mental well-being in making its best interests of the children finding, this does not mean that the court did not consider L.B.'s, M.B.'s, or Y.B.'s physical, emotional, or mental well-being. The court made its best interests of the children finding at the end of its termination order. A fair reading of the court's termination order showed that the court's fact-findings within the order were interrelated and supported its ultimate finding that termination of Father's parental rights was in the children's best interests. And, as outlined in the preceding section, significant evidence supported that Father had serious ongoing drug and anger problems that rendered him largely unable to comply with his reintegration case plan tasks during the 31 months the children remained out of his care and custody. Highly summarized, the evidence listed in the preceding section about Father's ongoing drug problems, ongoing anger issues, and general failure to comply with his reintegration case plan tasks demonstrated clear and convincing evidence that termination of his parental rights was in the children's best interests. On that basis, because clear and convincing evidence is a higher standard than the required preponderance of evidence for a best interests finding, Father's contention is unpersuasive.

Father has failed to argue that the trial court abused its discretion in making the best interests finding. The decision rests in the district court's sound judicial discretion. *In re R.S.*, 50 Kan. App. 2d at 1116. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Biglow v. Eidenberg*, 308 Kan 873, 893,

424 P.3d 515 (2018); *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). The party asserting the trial court abused its discretion bears the burden of showing such abuse of discretion. *Gannon v. State*, 305 Kan. 850, 868, 390 P 3d 461 (2017). Here, Father makes no credible argument that the trial court made a mistake of law, or fact, or ruled in manner that is unreasonable. And, we find no error of law, or fact, and given the evidence presented at the hearing the trial court's finding concerning the best interests of the children is not unreasonable. Thus, we affirm the trial court's best interests finding.

In addition, Father did not object to the trial court's best interests of the children finding as inadequate while before the court. Our Supreme Court has previously explained:

"[A] litigant must object to inadequate findings of fact and conclusions of law in order to give the trial court an opportunity to correct them. In the absence of an objection, omissions in findings will not be considered on appeal. Where there has been no such objection, the trial court is presumed to have found all facts necessary to support the judgment. [Citation omitted.]" *Hill v. Farm Bureau Mutual Insurance*, 263 Kan. 703, 706, 952 P.2d 1286 (1998).

This rule applies in the context of family law cases. See *In re T.M.M.H.*, 307 Kan. 902, 918, 416 P.3d 999 (2018); and *In re J.W.B.*, No. 123,606, 2021 WL 3469198, at *6 (Kan. App. 2021) (unpublished opinion).

Here, because Father never objected to the trial court's best interests of the children finding as inadequate while before the court, Father never gave the court an opportunity to correct any inadequacies with its best interests of the children finding. Thus, we presume (1) that the trial court found all facts necessary to support its judgment that termination of Father's parental rights was in L.B.'s, M.B.'s and Y.B.'s best interests and (2) that it did so while giving primary concern to their physical, emotional, and

mental well-being. Because we presume that the court found all facts necessary to support its best interests of the children finding while giving primary concern to their physical, emotional, and mental well-being, Father's current complaint necessarily fails. That is to say, because we must presume that the court made all fact-findings necessary to support the termination of Father's parental rights, Father can never prove that a preponderance of evidence did not support the court's best interests of the children finding.

To conclude, although the trial court's best interests of the children finding is brief, the court found that termination of Father's parental rights over L.B., M.B., and Y.B. was in their best interests given the specific evidence in this case. And although Father argues that the specific evidence of the children's CINC cases did not provide the court with sufficient evidence that termination of his parental rights was in the children's best interests, the evidence presented in this case plainly provides more than a preponderance of evidence to support the trial court's best interests finding.

Lastly, even assuming the court's best interests of the children finding was inadequate, Father waived any argument he had regarding potential inadequacies with the court's best interests of the children finding by not objecting to it as inadequate while before the trial court.

For all these reasons, we affirm the trial court's termination of Father's parental rights over L.B., M.B., and Y.B.

Affirmed.